IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 19-39 |
| MATT JONES | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                                                      **JUNE 25, 2019**

Presently before the Court is Defendant's Motion to Suppress Physical Evidence. (ECF No. 38.) For the following reasons, Defendant's Motion will be denied.

**I. BACKGROUND**

On January 16, 2019, a grand jury returned an Indictment charging defendant Matt Jones with conspiracy to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(i) (Count 1); possession with intent to distribute, and aiding and abetting possession with the intent to distribute, 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i) and 18 U.S.C. § 2 (Count 2); and possession of, and aiding and abetting possession of, a firearm in furtherance of a drug trafficking crime, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c) and § 2. Defendant seeks to suppress evidence obtained by police and drug task force officers as a result of their entry into Defendant's home at 108 Federal Street in Bensalem Township, Pennsylvania, on July 17, 2018. Evidence was observed in plain view after the officers used a ruse to gain entry into Defendant's home in order to execute an arrest warrant for Carol Lucy, who was present in Defendant's home at the time.[1]

---

[1] Officers falsely stated that they had received an abandoned 911 call from the residence. (Hr'g Tr. 8, ECF No. 40.)

As a result of observing drug paraphernalia in plain view, the officers obtained a search warrant for the premises and, later that day, executed the search warrant, seizing drugs, guns, and other drug paraphernalia.

Defendant filed the instant Motion on April 12, 2019. The Government filed a Response on April 26, 2019. (Gov't's Resp., ECF No. 39.) An evidentiary hearing was held on May 2, 2019. (Hr'g Tr.) The following three witnesses testified at the hearing: Corporal Joseph Gansky of the Bensalem Township Police Department, who was one of the officers who entered Defendant's home on July 17th; Detective Joseph George of the Philadelphia Police Department, who was an investigating officer in Defendant's case who also entered Defendant's home on that date; and Detective Dale Keddie of the Bucks County District Attorney's Office, who was another investigating officer in Defendant's case. Detective Keddie's testimony primarily focused on Carol Lucy.

In addition to witness testimony, seven exhibits were entered into evidence (Hr'g Tr. 85-86): (1) a police incident form reporting the events of July 17, 2018 (Incident Form, Def.'s Ex. 4); (2) a photo of the front of Defendant's residence (Gov't's Ex. 1); (3) a search warrant for Defendant's residence, obtained after officers executed their arrest warrant for Lucy (Def.'s Search Warrant, Gov't's Ex. 2); (4) a report prepared by Immigration and Customs Enforcement regarding Lucy's dates and places of travel (Gov't's Ex. 3); (5) a criminal complaint against Lucy prepared by the New Jersey Police, dated June 29, 2018 (Lucy Compl., Gov't's Ex. 4); (6) an order from the New Jersey Superior Court authorizing officers to locate Lucy's phone (Lucy Ping Order, Gov't's Ex. 5); and (7) a form authorizing officers to search Lucy's home,

signed by Lucy (Lucy Consent Form, Gov't's Ex. 6).[2] Defendant did not testify. After the hearing, the Government and Defendant each filed Supplemental Memoranda in support of their respective positions. (ECF Nos. 44, 45.) The Government filed an additional memorandum in support of its Supplemental Memorandum. (ECF No. 46.)[3]

Defendant contends that the entry into his home was a violation of the Fourth Amendment because the officers did not have a search warrant and he did not voluntarily consent to the officers entering. Defendant contends that he was deceived by the officers' ruse, and that any evidence seized by the officers as a result of this unconstitutional entry into his home, as well as any evidence seized as a result of Lucy's consent to search her own home, is "fruit of the poisonous tree" and must be suppressed. Defendant also argues that the officers used Lucy's arrest as an excuse to gain entry to Defendant's home because Defendant was the real target of their investigation. The Government contends that the ruse that they used to originally gain entry to Defendant's home did not render Defendant's consent involuntary, and that the subsequent searches and seizures resulting from the original entry were not unconstitutional. The Government is correct. Defendant's consent to the entry of the officers was voluntary and all evidence ultimately seized as a result of that entry will not be suppressed.

## II. FACTUAL FINDINGS

On June 29, 2018, the State of New Jersey issued an arrest warrant for Carol Lucy for various drug-related charges. (Lucy Compl.) On July 9, 2018, the Superior Court of New Jersey

---

[2] Defendant also moved to enter into evidence an exhibit described as "D-2." (Hr'g Tr. 86.) The request to move this exhibit into evidence appears to have been a mistake because Defendant never used this exhibit or showed it to the Court. (*See generally* Hr'g Tr.)

[3] A grand jury returned a Superseding Indictment on June 19, 2019, charging Defendant with three additional counts of knowing and intentional distribution, and aiding and abetting distribution, of heroin. (ECF No. 54.) Counsel have advised the Court that the Superseding Indictment does not affect this Motion.

issued a "ping order" allowing investigators to electronically locate Lucy's cellular telephone. (Lucy Ping Order; Hr'g Tr. 41.) On July 17, 2018, the New Jersey State Police informed the various law enforcement agencies involved in Lucy's case that Lucy was located at Defendant's residence, 108 Federal Street in Bensalem, Pennsylvania. (Hr'g Tr. 6, 15, 40, 82.) Lucy did not reside at 108 Federal Street. On the morning of July 17th, as many as 15-20 law enforcement personnel went to the area of 108 Federal Street. (*Id.* at 7, 15, 17, 42, 78.) Two of the officers, Corporal Joseph Gansky and Detective Joseph George, approached the home. (*Id.* at 10, 17-18, 24, 38, 55, 60.) The other officers remained down the street. (*Id.* at 17.) The officers who approached the home had weapons but did not brandish their weapons. (*Id.* at 10, 18.) All but one of the officers were in uniform. (*Id.*)

Gansky knocked on Defendant's door. (*Id.* at 8.) Defendant answered. (*Id.*) Gansky stated that they had received an abandoned 911 call from the residence and "asked [Defendant] if we could come inside to talk to him." (*Id.*) Gansky testified that he knew the statement was false but that this ruse was necessary. (*Id.* at 56-57, 69.) He explained that there are "officer safety issue[s]" involved when officers go to the door of a residence and say that they have an arrest warrant for someone in the residence for narcotics violations. (*Id.* at 9, 42.) This is especially true here, where Defendant was himself a target of the drug investigation. (*Id.*) Defendant permitted the officers to step into the foyer area and Gansky explained to Defendant that abandoned 911 calls often involve domestic issues, such that the officers would like to take a look around. (*Id.* at 8, 20.) Defendant said "no problem." (*Id.* at 43.) Gansky and George both testified that Defendant stated there was no one else in the house. (*Id.* at 21-22, 69.) Gansky and George testified that Defendant appeared "extremely nervous" but was not under the influence of drugs and appeared to understand what the officers were saying to him. (*Id.* at 13, 44-45.)

4

George testified that Defendant told him that the officers could come inside to look for any injured persons. (*Id.* at 43, 69.) Defendant has neither admitted nor denied that he gave this consent. The officers then followed Defendant upstairs to the living room and kitchen area of the home. (*Id.* at 13.) Gansky immediately noticed a money counter in plain view on a counter in the kitchen. (*Id.*) As the officers moved through the home, they observed in plain view a scale, baggies, razor blades with residue, and guns. (*Id.* at 13, 43, 62, 70.) Lucy was found on the third floor of the home and the officers arrested her. (*Id.* at 14, 43-44.) Later that day, based on the evidence in plain view, the officers obtained a search warrant for Defendant's home. (*Id.* at 14, 46-47; Def.'s Search Warrant.) The instant charges against Defendant are the result of the evidence seized when the officers executed that search warrant. After Lucy's arrest, she provided incriminating information about Defendant's involvement in a drug conspiracy and signed a consent form for law enforcement to search her residence at 1751 Forster Street. (Hr'g Tr. 78; Lucy Consent Form.) Defendant seeks to suppress all evidence seized as a result of an unconstitutional entry into his home and the search of Lucy's home.

## III. LEGAL CONCLUSIONS

"As a general rule, the burden of proof is on a defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). "However, once the defendant has established a basis for his motion . . . the burden shifts to the government" to show that this conduct did not violate the defendant's constitutional rights. *Id.* (citation omitted). "It is a basic principle of Fourth Amendment law that 'searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Ware v. Riley*, 25 F. Supp. 3d 492, 499 (D. Del. 2014) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)), *aff'd*, 587 F. App'x 705 (3d Cir. 2014). A home may not be entered without a search warrant even if the government has

an arrest warrant for a person who is located in the home, if the home belongs to a third party. *Steagald v. United States*, 451 U.S. 204, 211-216 (1981); *United States v. Vasquez-Algarin*, 821 F.3d 467, 469, 480 (3d Cir. 2016). One of the "specifically established exceptions" to the requirement that officers have a warrant to enter a property is when the person residing at the property consents to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Davis v. United States*, 328 U.S. 582, 593-594 (1946); *Zap v. United States*, 328 U.S. 624, 630 (1946)). The government bears the burden of demonstrating that consent to enter was "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (citations omitted).

In determining whether consent was freely and voluntarily given, courts must examine the totality of the circumstances surrounding the entry. *Schneckloth*, 412 U.S. at 227. Relevant factors include the personal characteristics of the defendant, such as "the age, education, and intelligence of the subject," as well as the subject's experience with the criminal justice system. *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009) (citations omitted). Also relevant is "whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; . . . the use of physical punishment[; and] . . . the setting in which the consent was obtained and the parties' verbal and non-verbal actions." *Id.* (alterations and citations omitted).

A. **Waiver of Fourth Amendment Rights**

Defendant argues that the officers violated his Fourth Amendment rights. Specifically, he argues that his consent was involuntary because the officers used a ruse to gain the consent. The Government argues that officers may use deception under some circumstances to gain entry to a person's home, and that the deception used in this case did not render Defendant's consent involuntary.

"It is beyond debate that deception is a well-established and acceptable tool of law enforcement." *Pagán-González v. Moreno*, 919 F.3d 582, 591 (1st Cir. 2019) (citing *Sorrells v. United States*, 287 U.S. 435, 441 (1932)); *see also United States v. Butler*, 405 F. App'x 652, 656 (3d Cir. 2010) (explaining that officers may use deception during investigations, such as for undercover work). Courts have held that officer deception may render consent involuntary under two circumstances: when the officers falsely represent that they have a warrant even though they do not, and when the officers falsely state that an emergency situation requiring urgent action exists. *See Bumper*, 391 U.S. at 550 (holding consent involuntary when police falsely state they have warrant because police are "announc[ing] in effect that the occupant has no right to resist the search"); *United States v. Harrison*, 639 F.3d 1273, 1276, 1281 (10th Cir. 2011) (affirming district court's holding that consent was not voluntary when police gained entry to home of suspected drug trafficker by stating that "our office received an anonymous phone call there were drugs and bombs at this apartment"); *United States v. Parson*, 599 F. Supp. 2d 592, 606-09 (W.D. Pa. 2009) (holding consent to be involuntary and product of intimidation when three officers converged on the trailer of 65 year-old man and convinced him that he was victim of identity theft in order to gain access to his computer); *see also Pagán-González*, 919 F.3d at 595 (collecting additional cases). The crux of the cases that have held that consent was vitiated by deception is that, "[w]hen an officer lies about the existence of exigent circumstances, he also suggests that the occupant has no right to resist and may face immediate danger if he tries." *Id.* at 595 (quoting *United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017)).

In this case, the officers' ruse did not suggest that Defendant had no right to resist or may have faced immediate danger if he tried. The officers in this case did not falsely state that they had a warrant. Rather, they approached Defendant and stated that they had received an

abandoned 911 call and would like to take a look around. This does not rise to the level of creating a false emergency, such as representing that there is a bomb in the apartment or that Defendant may have been the victim of identity theft, as was the case with the defendants in *Harrison* and *Parson*. The ruse only involved a nebulous abandoned 911 call. The officers speaking to Defendant represented that they were unsure of the nature of the call. Moreover, Defendant was aware that neither he nor Lucy were injured or had made a 911 call. Therefore, there is no reason why Defendant would have felt pressured to allow entry into his residence, when he knew that he was not hindering a legitimate investigation. *Cf. United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 291 (S.D.N.Y. 2008) (finding consent vitiated where police used ruse of missing girl to gain access to defendant's room because, although defendant knew girl was not present, he "had every reason to believe that his failure to consent to the search would hinder or delay the efforts to resolve safely (what appeared to be) a grave emergency").

Other circumstances also indicate that Defendant's consent was voluntary and that he understood the situation. Defendant is a 35 year-old adult and is very familiar with the criminal justice system. He has had a number of arrests and several convictions. (Hr'g Tr. 45, 47.)[4] He was approached at his home at a reasonable hour in the morning for a relative non-emergency. *Cf. Krause v. Commonwealth*, 206 S.W.3d 922, 926 (Ky. 2006) (finding consent vitiated because officers used ruse and approached defendant "at an alarming hour (4:00 a.m.) with unnerving news—a young girl had just been raped"). No more than four officers came to Defendant's door,

---

[4] Defendant's criminal convictions are matters of public record and we may take judicial notice of them. *See* Fed. R. Evid. 201(b) (permitting judicial notice of matters of public record). The Defendant's criminal record is available through the Unified Judicial System of Pennsylvania court record database, https://ujsportal.pacourts.us/DocketSheets/CP.aspx. *See, e.g., Commonwealth v. Jones*, No. CP-51-CR-0407581-2002 (Phila. Ct. Com. Pl.); *Commonwealth v. Jones*, No. CP-51-CR-1204771-2002 (Phila. Ct. Com. Pl.); *Commonwealth v. Jones*, No. CP-51-CR-0611711-2006 (Phila. Ct. Com. Pl.).

none brandished their weapon, and at least one was in plainclothes. *Cf. Parson*, 599 F. Supp. 2d at 607 (finding consent vitiated due to intimidation, among other things, because "three agents [had] entered the small trailer of a 65-year-old man"). Based on the description of the circumstances, as explained by Gansky and George, although Defendant appeared nervous and became frustrated, the encounter was largely unremarkable. The officers obtained verbal consent from Defendant before moving past the entryway of the house. It is not suggested that the officers used physical force on Defendant or subjected Defendant to prolonged interrogation or repeated questioning. *See Price*, 558 F.3d at 278 (finding relevant "the repetition or duration of the questioning; [and] . . . the use of physical punishment").

In short, the totality of the circumstances indicate that Defendant's consent was voluntary. This situation is not comparable to those cases that have held that a ruse by law enforcement vitiated a defendant's consent to enter their home. The Government has met its burden in establishing that Defendant's consent was voluntary.

**B.     Ulterior Motive**

Defendant also argues that the officers' true purpose in entering Defendant's home was to obtain evidence against Defendant. He argues that the officers knew of Lucy's location for some time prior to her arrest, yet chose to arrest her when she was present in Defendant's home so that they could obtain evidence against Defendant at the same time.

There is no evidence supporting the argument that the officers purposefully chose to arrest Lucy while she was in Defendant's home. Although Defendant was a target of the officers' investigation, Detective George credibly testified that the officers did not have any intent to search Defendant's home for drug paraphernalia prior to Lucy's arrest. (Hr'g Tr. 48-49.) The officers were at Defendant's home because they had an arrest warrant for Lucy and she

was located in the home. Detectives George and Keddie stated that they did not have any intention of "grab[bing]" Defendant at the same time as Lucy. (*Id.* at 53, 83.) Detective Keddie also testified that they waited to arrest Lucy until she returned from a trip she had taken to Miami, Florida, in July, and that the scheduling of Lucy's arrest depended on the priority of warrants that the Fugitive Task Force Unit received. (*Id.* at 76, 83.) There is no evidence to support an inference that the officers' true purpose in entering Defendant's home was to obtain evidence against Defendant. Defendant has not established any Fourth Amendment violations.

## IV. CONCLUSION

The search of Defendant's residence was lawful and the seizure of evidence from that property was also lawful. The statements by Lucy and the seizure of evidence from Lucy's residence, gained as a result of her arrest in Defendant's residence, were also lawful. Therefore, Defendant's Motion to Suppress Physical Evidence will be denied.

An appropriate Order follows.

BY THE COURT:

R. BARCLAY SURRICK, J.